49 CCPA

**Morris B. FINKELSTEIN and Burton R. Clay, Appellants,**

v.

**Sol. L. REICHES, Appellee.**

**Patent Appeal No. 6818.**

United States Court of Customs and Patent Appeals.

July 25, 1962.

Carl Vernon Olson, Princeton, N. J. (Albert Russinoff, Princeton, N. J., of counsel), for appellants.

Hugh H. Drake, Chicago, Ill. (Francis W. Crotty, Chicago, Ill., of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH and SMITH, Associate Judges, and Judge WILLIAM H. KIRK-PATRICK.*

RICH, Judge.

The Board of Patent Interferences awarded priority of invention to Sol L. Reiches, senior party in interference No. 89,186,[1] and the junior party, Morris B. Finkelstein and Burton R. Clay,[2] have ap-

---

\* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28, United States Code.

1. Reiches is involved in this interference on application Ser.No. 490,296, filed February 24, 1955, entitled "Magnetic Centering Device For Multiple Ray Beam Cathode Ray Tubes," assigned to Zenith Radio Corporation, into which claims were copied from the junior party's patent.

2 The junior party, Morris B. Finkelstein and Burton R. Clay, is involved in this

interference on patent No. 2,795,717, granted June 11, 1957, to Radio Corporation of America, on application Ser. No. 525,651, filed August 1, 1955, entitled "Cathode Ray Beam Centering Apparatus." R.C.A. petitioned, under the provisions of 35 U.S.C. § 256 and Rule 324, 35 U.S.C.Appendix, for a Certificate of Correction removing Morris B. Finkelstein as a joint inventor in the patent herein involved. Issuance of the certificate, although approved, is being withheld pending termination of the interference. The junior party remains, formally, Finkelstein and Clay, hereinafter referred to for convenience as "Clay," who is the sole inventor.

pealed. The board summarized the situation that the proofs, as it saw them, presented to it as follows:

"* * * we find the situation to be that Clay is the first to establish conception, pegged to September 1953; Reiches with evidence of conception in the last months of 1953, with some uncertainty and not good enough to antedate Clay; with clear evidence of conception in January of 1955 and constructive reduction to practice in February of 1955. Clay has no evidence of diligence in January and February of 1955, so that the case turns on the question of whether Clay reduced to practice during October-December, 1953, as he asserts."

Appellants agree that the sole issue is whether Clay has proved an actual reduction to practice by a preponderance of the evidence. The argument they have made in this court makes no contention that there was such a reduction to practice prior to the two-month period "November-December 1953" and whether it was proved by a preponderance of the evidence is the sole question we have to decide.

To understand the discussion of the evidence it is necessary to have some technical knowledge of the invention, which we shall now explain.

The invention of the counts is a beam centering device for centering the "raster" or picture image on the face of a television picture tube or the like which, as is well-known, consists of two main portions, a picture area and an elongated cylindrical neck. The technical name for this tube is a "kinescope" or "cathode ray beam tube." An electron gun is located in the end of the tube neck and supplies an electron beam, or stream of

electrons, which travels to and is caused to scan the viewing screen. Surrounding the neck of the tube is an electromagnetic deflection yoke consisting of a pair of magnet coils called, respectively, horizontal and vertical electron beam deflection coils whose axes are at right angles to each other and intersect on the axis of the tube neck. The intersection is called the deflection center of the yoke.[3] The deflection yoke coils are supplied with periodically varying currents and are so shaped and physically related with respect to the tube neck that as the currents passing therethrough are varied, so are the magnetic fields of the coils. These fields are capable of deflecting the electron beam passing through the neck, both horizontally and vertically. The currents and their variations within the coils control the rapid traces of the electron beam on the kinescope screen and produce the picture, or "raster" as it is technically known.[4] (As all TV viewers know, the raster is sometimes not a picture.)

The record discloses that for a number of possible reasons the center of the raster may not coincide with the center of the kinescope screen. The instant invention provides means by which the raster may be centered without distorting the raster.

As to centering in general, appellants' brief states:

"Basically, there are two kinds of centering, 'electrical' (i.e., *electro-magnetic*) and 'magnetic' (i. e., permanent magnetic). In the case of 'electrical' centering, a direct current (d.c.) is passed through the coils of the deflection yoke (in addition to the 'scanning' currents) to produce a static, but adjustable, magnetic field within the picture tube. The picture may be centered

---

3. An understanding of the terminology of the counts necessitates the designation of another axis, that of the deflection yoke taken as a whole. This axis is the axis of the opening in the yoke through which passes the neck of the kinescope. It coincides with the axis of the kinescope neck.

4. Reiches, for example, states in his specification that it is "normal television practice * * * to cause the ray beam to make about 15,000 horizontal sweeps per second * * *, [and] 60 vertical transverses per second."

by adjusting the magnitude and direction of the d. c. applied to the coils.

"*The subject matter of the interference is of the magnetic type, in which adjustment of picture centering is accomplished by means of a pair of permanent magnets.*" [Emphasis ours.]

Appellants' specification discusses the background of the instant invention as follows (all emphasis ours):

"Although various permanent magnet devices for cathode ray beam positioning have been disclosed in the prior art, experience has shown that with prior art permanent magnet arrangements, undesirable distortion of the television raster results if too much beam centering correction is attempted. Moreover, in carrying out beam centering control in kinescopes, of the color variety, it has been found that unless the beam centering device is imposed on the electron stream *within the kinescope at the deflection center of the deflection yoke* a defocusing effect of the cathode ray electron stream is produced as the beam is deflected thereby resulting in what appears to be convergence difficulties and a degradation in the color purity throughout the reproduced color image.

"It is, therefore, an object of the present invention to provide improved beam centering for cathode ray devices.

"It is further an object of the present invention to provide an improved beam centering apparatus for cathode ray beam devices intended for use with electromagnetic deflec-

tion systems and especially such devices in which the centering control is desirably imposed *at the deflection center of the electromagnetic deflection yoke.*"

In addition to the proper placement of the beam centering device, as indicated in the italicized portions of the preceding passages, the record shows that the magnetic material from which the permanent magnets used in the centering devices are made must possess particular characteristics to satisfactorily perform their raster-centering function without affecting or being affected by the rapidly varying magnetic fields of the deflection yoke. More particularly, this magnetic material must possess (1) permeability as close to unity as possible [5] so as not to disturb the magnet fields of the deflection yoke coils; (2) high resistivity; [6] and (3) high coercivity [7] because of the tendency of the rapidly changing magnetic fields of the deflection yoke coils to induce eddy currents in and decrease the magnetism of the magnetic material. Barium ferrite is disclosed as being a material which possesses these desired characteristics.

One form of permanent magnet centering device disclosed by both parties consists of two similarly shaped rings magnetized to produce fields of substantially equal force. The rings have inner diameters to fit freely over the kinescope neck and outer diameters to fit within the deflection yoke's tube neck access opening. The rings may be magnetized in several ways, one of which locates the opposite magnetic poles at the opposite extremities of a ring diameter. It is the steady unidirectional effect that the magnetic fields of these rings have on the electron beam or beams passing through the neck of the kinescope that results in the centering of the raster. By mounting

---

5. Permeability relates to the ease with which a particular material allows magnetic lines of force to permeate it. The permeability of air is unity. If a material has a permeability of 1, it has the same permeability as air.

6. Whenever rapidly changing magnetic fields permeate a magnetic material small circulating currents tend to be created

within the material called eddy currents. The formation of such currents is undesirable because they tend to reduce the efficiency of the material as a magnet. High resistivity minimizes them.

7. Coercivity relates to the ability of a permanent magnet to retain its magnetism.

the rings on carriers, such as insulating tubing within the deflection yoke, so they may be rotated either in unison or relative to each. other, the resultant beam-deflecting force exerted by the rings' magnetic fields may be varied in both magnitude and direction. For example, if the two rings are so oriented that their magnetic fields are aligned in the same direction, the resultant centering force will be in the direction of the magnetic fields and have a magnitude twice that exerted by either ring field alone. To generalize from this example, the centering force exerted by the rings on an electron beam will be in the direction of, and in magnitude proportional to, the net flux or vector sum of the rings' magnetic fields.

The interference involves two counts. Count 1 reads:

"1. A beam centering device for use in conjunction with a cathode ray beam display apparatus, said display apparatus comprising, a cathode ray beam tube having a neck portion surrounded by an electromagnetic deflection yoke including a plurality of electrical deflection windings, said deflection windings being physically so formed as to define a magnetic deflection center and to provide an axial access opening in said yoke so dimensioned as to freely accept with substantial predetermined clearance the neck of said cathode ray beam tube so as to permit the positioning of said yoke in surrounding relation to said neck with said magnetic deflection center positioned at a predetermined desired point of cathode ray beam deflection influence yet to define a clearance space between portions of said windings and said neck, said beam centering device comprising: adjustable permanent magnet means so dimensioned as to freely enter said clearance space between said windings and said neck, said means comprising a structure of magnetic material having a permeability of the same order of magnitude as that

of air so as to minimize distortion of the magnetic field distribution otherwise provided by said deflection windings, said permanent magnet means being so permanently magnetized as to maintain a substantial magnetic potential and resulting flow of magnetic flux along a path transverse to the axis of said deflection yoke access open-. ing, said permanent magnet means being positionable in the immediate vicinity of said magnetic deflection center within said yoke to cause a static displacement of the cathode ray within said cathode ray beam display apparatus."

Count 2 is similar but calls for *two* permanent magnets.

The work relied on by the junior party to establish actual reduction to practice is that of Burton R. Clay "in November-December, 1953." As background, we shall first discuss the efforts of Clay leading up to that period.

During 1953, Clay was an engineer in the Color Product Development Section of R.C.A. in Camden, New Jersey, headed by Loren R. Kirkwood. During the first half of 1953, Clay was instructed by Kirkwood to develop a *magnetic* centering device for use in a color television receiver. The main problem facing Clay at this time was acquiring a magnetic material for use in such a device which would not distort the deflection yoke's fields and which would maintain unimpaired its own magnetic field when the device was placed at the "deflection center" of the yoke.

In 1952 Clay read an article describing a new magnetic material, a barium ferrite, which when magnetized was characterized by low permeability and high resistivity and coercivity. During the middle of 1953 Clay made his "original * * * experimental" device which consisted of a pair of rings, the exact permeability of which is not clear from the record, "glued or Scotch taped" to a pair of concentric cardboard cylinders. Alton John Torre, who then supervised the electrical engineering activity of

R.C.A.'s Color Product Development Section, testified that such an early Clay device was "actually tested," i. e., "inserted within a yoke." While the results of these tests were stated by Torre to prove "the feasibility of the approach," Torre additionally stated that the device "was by no means statisfactory for any future use."

A "Status Report—Month of August, 1953," by Clay, dated September 8, 1953, while not specifically identifying Clay's previously discussed device, states that the "first model" of a permanent magnet centering device placed within the deflection yoke while "giving 5″ movement of raster * * * did not have a uniform enough field to give immunity from convergence interaction."

Early in September of 1953 Kirkwood, based on his opinion that Clay's original work "showed possibilities," authorized development of a "more stable operating device for greater evaluation" of Clay's work.

On September 12, 1953, James W. McLeod, draftsman, prepared a set of drawings from which ultimately was to be made the "more stable" device. It is the results obtained with this second device, tested in November-December 1953, which appellants claim to be their actual reduction to practice.

Preliminary to a discussion of it, we may say that appellants' testimony concerning the operation and construction of this second device is not free from confusion.

As to the date of construction of this second device, Clay stated at one point that it might have been *ordered* "a few days after the drawing was made"; at another he stated that this device was *made* "shortly after the completion of drawing Exhibit C, which would be within one to perhaps three days of 9–12–53"; at still another point Clay stated that this device was received "from the shop" approximately "two to two and a half weeks after the issuance of the drawing which was marked Exhibit C, and which

it [is] dated 9–12–53." Robert K. Lockhart, an R.C.A. electrical engineer, who worked under Mr. Torre and who supervised Clay's work after October 1, 1953, testified that at the time of Clay's Status Report for the month of October (October 28, 1953) and of his own October Status Report (October 29, 1953), "We had not yet received Exhibit D [the second device]. We were still operating with the Exhibit B [original] type of support for the rings."

From such conflicting, oral, undocumented testimony we can only conclude that the improved Clay device was made sometime between September 13, 1953, and the beginning of November.

Referring again to these reports, we note that Lockhart's October Status Report indicates that "PM [permanent magnet] centering appears to work but is not a complete development due to the mechanix." Clay's October Status Report states that "Internal centering devices are being received but due to mechanical and magnetic errors are not demonstrable as yet." Both Clay and Lockhart seem to agree that most of the magnetic difficulties mentioned in these reports were due to the unavailability of rings having a permeability near unity. Lockhart testified that the mechanical difficulties mentioned in his report were corrected by the second device. Clay was silent on this point. Taking this portion of the record together with the Clay and Lockhart testimony, we are left in doubt as to the performance, as well as the existence, of the second device in a period up to the beginning of November, 1953.

The record is somewhat confused on another point. The drawings of September 12, 1953, for the second device, call for *four* magnetic rings and three ring spacer elements to be used in this device in conjunction with concentric sleeves similar to those used in the original device. It is clear from the record that the second device was made from the September 12, 1953, drawings and that only one such device was made. The record, however, is silent as to the number of

rings actually used in the second device. The board noted this fact when it stated that "we do not know how many sets of rings were tried with it [the second device]." In discussing this point Clay stated that "it turned out in practice that I needed only a single pair, especially of this kind of material [barium ferrite]." No statement appears in the record as to *when* this discovery "in practice" took place. The record therefore leaves it uncertain as to exactly how the second device was constructed during the latter part of 1953.

It is against this background that we come to the "November-December" tests upon which the junior party relies for its alleged actual reduction to practice. At the outset we note that the record is devoid of any contemporary document indicating what took place at these tests, what specific results were obtained therefrom, and under what conditions they were held. If notes were taken at these tests, none appear in the record. As previously stated, the exact construction of the device tested is also in doubt. And there is at least some doubt as to the composition of the magnetic rings used in these tests.

As to the surrounding circumstances of the tests, George Singleback, an R.C.A. electrical engineer who in 1953 worked under Mr. Lockhart, stated that a laboratory test rig was used with the centering device mounted on the neck of a kinescope which was placed in a shielded cage and connected to a television chasis "maybe eight or nine feet, something like that," away. The ring material was stated by Singleback to have had a "permeability of close to air," and to be placed around the kinescope neck at the deflection center of a deflection yoke. As to the results of this test Singleback stated, "the demonstration I saw was successful. It accomplished the result intended, that the raster would center."

Referring to the "laboratory setup" under which tests during the months of November and December of 1953 were made, Lockhart stated that "the results

appeared to meet the specs as we had stated them. As far as I was concerned it was commercially acceptable." Questioned with respect to the nature of the "specs," Lockhart stated that "there was no quantitative specification on" convergence error or purity error. It also appears that tests were made "about Christmas-time" on a receiver designed "between the period from late '53 until the middle of 1954." These tests were made on the complete receiver unit when "in cabinet." This receiver Lockhart stated never went into production. Its construction is not made clear from the record. Clay, apparently referring to this receiver, stated that "it was kept in the laboratories for a period of time until it became obsolete and was then destroyed."

Clay testified that as to tests of the second device, performed "possibly as early as October, but certainly in November and in December," they indicated that the device was "very satisfactory."

Finally, we note, with respect to tests that occurred "I would say October-November of '53," that Torre stated that "acceptable effects" were attained.

Thus we have oral testimony of recollections some five years after the event by four witnesses all in the employ of the owner of the application to the effect the tests were "satisfactory," unsupported by any contemporary writing.

After these tests, Clay's permanent magnet centering device was dropped by R.C.A. in favor of electromagnetic centering. Clay's efforts were then directed to the development of a "z-axis Neutralizer for Color Kinescope," a Patent Disclosure Data Sheet for which appears in the record.

The last document in the record which refers to the work done by the junior party on permanent magnet centering is a Torre "Status Report—Month of January, 1954" stating in part, "At present E.M. [electromagnetic] centering has been included in this design [a 19″ receiver] until a more satisfactory P.M. design is developed." As to what was

meant by "a more satisfactory P.M. design," Torre testified:

"A. Well, in general we were not satisfied with respect to the 19″ receiver with any permanent magnet centering design which existed at the time, and we decided in the interest of the over-all 19″ receiver program we should proceed with E.M. centering.

"I can clarify further that the work on P.M. centering, early work, was specifically done on smaller sized tubes; on 15″ tubes, why, we were satisfied. There were smaller deflection angles and a lot of things that made the ground rules slightly different in each case.

"We were not too certain about supply of materials, so we didn't want to tie up any development. It would be very easy to delete E.M. centering at a later date in the interest of a workable supply of available P.M. devices, but we elected to go ahead to include E.M. centering, and play it safe."

We note, however, that the record contains statements by Clay, Lockhart, and Singleback that the November-December tests of the second device included tests on a 21″ kinescope. We are unable to reconcile Torre's comment that as to permanent magnet centering on a 19″ set R.C.A. was "not satisfied" with the comments, for example, of Lockhart and Clay that the November-December tests were "commercially acceptable," and "very satisfactory." If Torre was correct in his statement concerning deflection angles, it would seem that a 21″ set upon which Clay did some of his November-December work should have created even greater dissatisfaction in Mr. Torre's eyes than work on a 19″ set.

Asked why Clay's device was not used commercially, Clay, Lockhart, Torre, and Kirkwood each indicated that this was because R.C.A. was not confident that the material necessary for the centering device's rings could be consistently obtained. Torre, for example, said:

"Well, primarily we were not very confident or we were concerned about the ability of suppliers to give us the kind of material consistent with what we were after. We weren't sure of its availability, its quality * * *."

Finally, it was not until November 17, 1954, that a routine R.C.A. "Patent Disclosure Data Sheet" (an elaborate printed form) was filed concerning a permanent magnet kinescope beam centering device. This disclosure sheet was filed jointly by Morris B. Finkelstein and Burton R. Clay. It discloses the "Purpose, Summary and Probable Uses" of the invention in the following manner:

"It consists of a pair of transversely magnetized rings of permanent magnet ferrite placed at the center of deflection of the yoke between the yoke & kinescope neck. Its most practical uses are in transistor vertical deflection circuits and in color yokes where centering fields must not disturb the main deflection field."

These inventors stated on the data sheet that the invention was "conceived 6–11–54" and that construction of the device disclosed was completed and the completed device *first* tested on "8–9, 1954." On the basis of this disclosure appellants' application for the patent here involved was filed.

We find ourselves unable to relate in any way the work done by Clay in November-December of 1953 with that done in the middle of 1954 with his then co-inventor Finkelstein. It is clear that the two devices are structurally different; the parts of one, particularly the rings, are not usable with the other. The only relationship which exists appears from an equivocal statement that the 1954 work began with an "old centering device * * * having been made around the period of say November to December of 1953." Completely unexplained in the

record stands the statement that the invention disclosed in the November 1954 Patent Disclosure Data Sheet, which is supposed to be the one reduced to practice in 1953, was conceived on 6–11–54 and first tested in August of 1954.[8]

We think the junior party has failed to prove, by a preponderance of the evidence, actual reduction to practice of his invention in 1953. No contemporary document is in the record which indicates that appellants' permanent magnet device was ever successfully operated. To the contrary, each of the Status Reports in evidence indicates either expressly or by implication that success had not been achieved. Laboratory notes which it is customary for engineers to keep, and which Clay normally did keep on his work, are conspicuously absent from the record. So are the most important of all the Status Reports, if there were any, those for November and December of 1953. In the face of this lack of proof appellants have offered the testimony of several R.C.A. employees which does little to clarify the issue. The exact structure of the device tested is not clear from their testimony, particularly with respect to the all-important make up of the magnetic rings. With respect to the tests made during the period of November and December of 1953, the testimony is also vague—at times contradictory.

While it is understandable that, even though it had been successful, the Clay device might not have been placed in commercial production because of a lack of suitable source for the magnetic rings, as asserted, we have difficulty understanding why, if success had been achieved in November and December of 1953, a patent disclosure data sheet was not prepared until over eleven months later, after another permanent magnet raster centering device had been constructed and tested, and containing allegations as to dates of invention and test inconsistent with the assertions here made.

8. The closest the record comes to explaining this alleged conception date is in the statement of Clay: "I might add that

After reviewing the record we find no error in the board's award of priority to the senior party Reiches, based primarily on the conclusion, with respect to the November-December 1953 activity relied on, that "the picture presented by the entire evidence is one of abandoned experiment" by the junior party.

The decision of the board is affirmed.

Affirmed.

MARTIN, J., did not sit or participate because of illness.

49 CCPA

this conception date—well, I won't add that."